IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

   vs.                            No. CR 08-585 MCA

PASCUAL LAZCANO-NAVA,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion to Suppress and Memorandum in Support Thereof* [Doc. 19], filed May 19, 2008.  On July 30, 2008, the Court held an evidentiary hearing on Defendant's motion.  Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court grants the motion based upon the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

### A.    The Events Leading to the Traffic Stop

1.    Manny Maynes is a deputy sheriff in the patrol division of the Dona Ana County (NM) Sheriff's Department.

2.    On the morning of December 19, 2007, Deputy Maynes was working the day shift (6:00 a.m.-2:00 p.m.) in the county's northernmost area, which includes the town of Hatch, New Mexico.

3.      At the suppression hearing, Deputy Maynes described the area in which he was working that day as "rural," "mountainous," and a "pretty isolated desert area."

4.      I find and accept as credible Deputy Maynes' description of his patrol area.

5.      At approximately 10:50 a.m. on the day in question, Deputy Maynes pulled into the parking lot of the Pic Quick convenience store and gas station on Franklin Road in Hatch with the intention of using the store's facilities.

6.      Deputy Maynes testified that he did not actually use the facilities[1] because he noticed a Ford "wooden box van"[2] with what he described as an expired Colorado paper registration tag affixed to the back.

7.      According to Deputy Maynes, this paper tag "had a date of 2007."

8.      Deputy Maynes also testified that the tag was the size of a license plate and had black letters and red numbers.

9.      Deputy Maynes then made the decision "to check the van out" because he knows that the laws of New Mexico require that vehicles have valid registration tags.

10.     The actual paper tag (permit) was not produced at the hearing, nor was a photograph of it produced.

---

[1] Defendant Pascual Lazcano-Nava, however, testified that when he entered the Pic Quick, he "went straight to the bathroom and the officer was there in the bathroom."

[2] The insurance card for the vehicle identifies it as a 1989 Ford Econoline E350 Cargo van. [See Exh. C].

2

**B.      The Traffic Stop: Deputy Maynes' Version**

11.    According to Deputy Maynes, he activated his overhead lights to indicate a traffic stop "while [the van] was at the stop sign before it entered the Franklin roadway."

12.    Exhibit A depicts the Pic Quick and its relation to Franklin Road.  By Deputy Maynes' account, he would have initiated the stop while the van was still in the Pic Quick parking lot.

13.    Deputy Maynes testified that the van entered Franklin Road and "roll[ed] at a slow pace" in a northbound direction for approximately 75 yards before coming to a stop.

14.    Deputy Maynes "assume[d that the van stopped] because [he] had [his] lights and siren on."

15.    According to Deputy Maynes, once the van stopped he observed Defendant exit from the passenger's side and begin walking away from the van.  I do not find as credible this testimony.

16.    Deputy Maynes testified that his "awareness elevated" and he believed that something might be wrong because he had observed Defendant *enter* the van on the driver's side while it was still at the Pic Quick.  I do not accept as credible Deputy Maynes' testimony that he observed Defendant enter the van on the driver's side.

17.    Deputy Maynes also believed that something "might be wrong" because of the manner in which the van had slowly rolled to a stop.

18.    Deputy Maynes testified that he ordered Defendant to return to the van and, although Defendant hesitated, he ultimately complied.

3

19.    It is undisputed that Deputy Maynes did not include in his written report of the traffic

stop that Defendant had stepped out of the van and began walking away.

20.    It is Deputy Maynes' custom to include as much detail as possible in his written

reports. At the suppression hearing, Deputy Maynes agreed that Defendant's exit from

the van was an important detail and, in fact, is so important that it should have been

noted in his report.

21.    When asked why he failed to include that detail in his report, Deputy Maynes

responded, "I overlooked that . . . [d]ue to the fact that he complied with my

command to return back to the vehicle."

22.    However, Deputy Maynes was presented at the suppression hearing with a police

report he wrote on November 14, 2007 (involving an unrelated incident), in which he

*did* document that (1) the passenger of a vehicle that he had stopped exited the car and

began to walk away; (2) Deputy Maynes ordered him back; and (3) the passenger

"dusted himself off and then went back in."

23.    Deputy Maynes testified that the reason he documented the November 14 incident and

not the incident with Defendant was that the passenger involved in the November 14

incident "fail[ed] to comply with [his] commands." However, it is undisputed that the

passenger involved in the November 14 incident "dusted himself off and then went

back in" to the car.

24.    I do not find nor do I accept as credible Deputy Maynes' testimony with respect to

why he did not document Defendant's exit from the van or Deputy Maynes' order to

return to the vehicle.

25.     According to Deputy Maynes, once Defendant returned to the van, Deputy Maynes approached the van from the driver's side and made contact with the vehicle's occupants, including "a Ms. Flores[,] who was in the driver's side."[3]

26.     In addition to Defendant and Ms. Flores, Deputy Maynes testified that there was a third person, a man, in the vehicle.[4]

27.     Deputy Maynes testified that he identified himself and asked Ms. Flores for her driver's license, insurance, and registration.

28.     According to Deputy Maynes, "Ms. Flores provided me with a New Mexico license, I believe it was. . . ."

29.     Deputy Maynes also requested identification from Defendant who, according to Deputy Maynes, "had none."  Consequently, Deputy Maynes asked Defendant for his date of birth.

30.     According to Deputy Maynes, Ms. Flores did not hand him her registration and proof of insurance at that time, explaining that those documents were in the van's cargo area.

31.     Deputy Maynes testified that, for purposes of officer safety, he had Defendant and Ms. Flores step out of the van.  Deputy Maynes also testified that he did *not* ask any

---

[3]  Maria Veronica Barreras Flores is Defendant's wife

[4]  By contrast, both Defendant and Ms. Flores testified that they were traveling with two other people, Ms. Flores' daughter and brother.

other occupant or occupants to exit the vehicle.

32.     When questioned about his efforts to ensure his safety, Deputy Maynes stated that, although he "didn't want to get shot [and] didn't want to get attacked[, he] did not need the third person because he was—[Deputy Maynes] knew he would be inside the cab and it would be harder for [Deputy Maynes] to keep track of three persons instead of just two."

33.     I do not find nor do I accept as credible Deputy Maynes' testimony as to why he asked some—but not all—occupants of the van to exit it, particularly where his focus at the time was officer safety.

34.     Once Defendant and Ms. Flores were outside the van, Deputy Maynes began questioning them.  He testified that "[a]ll the questioning that [he] gave Ms. Flores, she would hesitate to answer.  She would look at [Defendant] and he would answer for her, whatever he related to her she would answer."

35.     Notwithstanding that Deputy Maynes called Ms. Flores' manner of responding "crucial evidence," he did not document in his written report that she did not answer his questions before consulting Defendant.

36.     Instead, as Deputy Maynes explained at the suppression hearing, because he "was in a hurry to call in the report, [he] overlooked that crucial evidence."  But Deputy Maynes also testified that he wrote up his report on December 20, 2007, a full day after the incident occurred.

37.     I do not find nor do I accept as credible Deputy Maynes' testimony as to why he did

6

not document Ms. Flores' manner of response.  Nor do I find credible his testimony that Ms. Flores would hesitate to answer and would look at Defendant and that Defendant would advise her on what to answer.

38.   Deputy Maynes testified and documented in his written report that Defendant appeared "extremely nervous."

39.   When Deputy Maynes contacted his radio dispatcher to provide the information he had on Defendant, "dispatch relayed . . . that [Defendant] had a hit as a probation violation."  Deputy Maynes later clarified, however, that dispatch advised that Defendant's information returned with a probation "alert," which Deputy Maynes construed as a  probation "violation."

40.   Indeed, in his written report, Deputy Maynes did not document a probation violation; instead, he confirmed at the suppression hearing that he wrote that "[a] probation alert returned from central dispatch on [Defendant] but was clear of warrants. . . ."

41.   At some point during his conversation with dispatch Deputy Maynes lost his radio connection, which he attributed to heavy traffic on the frequency he was using. Accordingly, Deputy Maynes used his cell phone to contact Border Patrol because (1) Border Patrol agents were closest in proximity to the scene of the traffic stop; (2) he knew that Border Patrol could check for warrants and had done so in the past; and (3) Border Patrol was "always" willing to assist him.

42.   According to Deputy Maynes, the Border Patrol agent to whom he spoke advised that Defendant had four prior deportations and "an extensive history."

7

43.     Thereafter, a Border Patrol agent arrived at the scene of the traffic stop and took Defendant into custody.[5]  The Border Patrol agent arrived approximately 20 minutes after Deputy Maynes first initiated the stop.

44.     At approximately the same time, canine officer Trey Gilmer arrived on the scene with his dog.

45.     Deputy Maynes testified inconsistently as to the manner by which Officer Gilmer came upon the scene, stating first that he (Deputy Maynes) called for a canine unit but maintaining later during the suppression hearing that he did *not* request it.

46.     In any event, it was at about this same time, testified Deputy Maynes, that Ms. Flores produced a valid Colorado registration for the van.  Deputy Maynes testified that Ms. Flores told him that the registration was on the front windshield.  I do not find nor do I accept as credible Deputy Maynes' version of the point in time at which Ms. Flores produced the valid Colorado registration.

C.      **The Traffic Stop: Defendant's Version**

47.     Defendant's version of the stop differed from that of Deputy Maynes, including that the van left the Pic Quick parking lot with his wife at the wheel.

48.     Defendant also testified that he and Ms. Flores were traveling with Ms. Flores' daughter, Carina (Defendant's step-daughter), and Ms. Flores' brother, Carlos.

_____

[5] Border Patrol subsequently fingerprinted Defendant and it was determined that he (1) was illegally in the United States; (2) had previously been deported from the United States; and (3) had not obtained permission to reenter. [See Doc. 24 at 1].

Defendant and Ms. Flores also both testified that at all relevant times, Ms. Flores was in the driver's seat, Carina was seated to Ms. Flores' right, Defendant was seated to Carina's right, and Carlos was seated in the passenger's seat to Defendant's right. The group was traveling southbound, from Denver to Mexico.

49.   According to Defendant, when the van pulled out of the Pic Quick parking lot, there were two vehicles behind it, and Deputy Maynes' unit was behind those two cars.

50.   Defendant testified that the van stopped at a small chile stand on Franklin Road, and *that* was when he noticed Deputy Maynes' unit with its lights activated.  Defendant also testified that, having seen the chile stand on their way to the Pic Quick, he and his fellow travelers made the decision to return to the stand after their stop at the convenience store.

51.   One the van had stopped, explained Defendant, Deputy Maynes approached the vehicle from the driver's side and asked Ms. Flores for her driver's license, registration, and proof of insurance, *which she provided*.

52.   I find and accept as credible Defendant's testimony that Ms. Flores provided the requested documentation to Deputy Maynes when Deputy Maynes asked for it.

53.   Contrary to Deputy Maynes' testimony that Defendant had no identification, Defendant testified that he had with him both (1) a copy of his Colorado driver's license; and (2) a consular card identifying him as a citizen of Mexico.

54.   Also, when presented at the suppression hearing with the radio dispatch incident report, [Exh. E], Deputy Maynes confirmed that he radioed his dispatcher with a

9

Colorado identification number for Defendant. When asked again if Defendant had provided him with a Colorado identification number, Deputy Maynes responded, "If I ran that, yes, ma'am he did."

55.    Accordingly, I find and accept as credible Defendant's testimony that at the time of the traffic stop, he was carrying forms of identification. I do not find nor do I accept as credible Deputy Maynes' testimony that Defendant was without identification.

56.    Defendant testified that, armed with Ms. Flores' drivers' license, registration, and proof of insurance, Deputy Maynes returned to his unit to verify the information contained therein. Deputy Maynes then returned to the van and removed Ms. Flores. Ms. Flores then returned to the van and collected identification cards from all the other occupants. At that point, narcotics officers arrived, removed all the van occupants, and conducted a canine sniff of the van.

**D.**    **The Traffic Stop: Ms. Flores' Version**

57.    Ms. Flores' testimony was largely consistent with that of Defendant.

58.    Ms. Flores testified that she has been a permanent resident of the United States for 25 years, and that she lives in Denver, Colorado.

59.    Contrary to Deputy Maynes' recollection that Ms. Flores produced to him a New Mexico driver's license, Ms. Flores testified that she possesses a Colorado driver's license and has never had a driver's license issued by the State of New Mexico.

60.    Given that Ms. Flores resides in Colorado, I find and accept as credible her testimony that her driver's license was issued by the State of Colorado. I do not find nor do I

10

accept as credible Deputy Maynes' testimony that Ms. Flores handed him a New Mexico driver's license.

61.   As did Defendant, Ms. Flores testified that when the van left the Pic Quick, she was driving, Carina was seated to her right, Defendant was seated to Carina's right, and Carlos was seated to Defendant's right.

62.   Ms. Flores explained that when the van arrived at the chile stand, the occupants got out and it was *then* that they realized Deputy Maynes was behind them because he ordered them over his unit's speaker "not to wander away" and to return to the van, which they did.

63.   I find that it is reasonable to infer that the van came to a stop when and where it did because its occupants had plans to shop at the chile stand, and not because Ms. Flores was responding to (or had even noticed) Deputy Maynes' lights and/or siren.

64.   Although Ms. Flores testified that "we" got out of the van at the chile stand, she later testified that Defendant did not exit the vehicle.

65.   According to Ms. Flores, Deputy Maynes approached the van from the left-hand side and asked her for her driver's license, registration, and proof of insurance.

66.   While Ms. Flores also testified that Deputy Maynes approached the van from the passenger side, I do not find this inconsistency to be material because (1) Ms. Flores subsequently clarified that Deputy Maynes actually approached on the driver's side; and (2) Ms. Flores' testimony that Deputy Maynes approached on the driver's side is consistent with the testimony of both Deputy Maynes himself and Defendant.

67.  According to Ms. Flores, when Deputy Maynes requested them, she removed her driver's license, registration and proof of insurance from her bag.

68.  I find and accept as credible Ms. Flores' testimony that she provided the requested documentation to Deputy Maynes when Deputy Maynes asked for it.  Conversely, I do not find nor do I accept as credible Deputy Maynes' testimony that Ms. Flores did not provide him with a valid registration until after Officer Gilmer and Border Patrol had arrived, by which time 20 minutes had elapsed since the stop was initiated.

69.  After Deputy Maynes checked the documents at his unit, he returned to the van and asked Ms. Flores for forms of identification for the other occupants of the vehicle, which she provided.

70.  Contrary to Deputy Maynes' testimony, Ms. Flores credibly testified that there was no paperwork (registration) displayed on the front dashboard or in the front window of the van.

71.  She also testified, contrary to Deputy Maynes' testimony, that when she was speaking with Deputy Maynes, Defendant was not feeding her answers, and that "[h]e didn't have to tell [her] anything because [she] was answering what the police officer was asking [her.]"

72.  According to Ms. Flores, after Deputy Maynes checked everyone's identification, the canine unit arrived, followed by Border Patrol.

73.  Ms. Flores also testified that at no point during the encounter with Deputy Maynes was Defendant acting nervous.

12

**E.      The Documentation and Paperwork Relating to the Van**

74.     Exhibits B, C, and D are, respectively, a *State of Colorado Certificate of Title*, a *Colorado Registration/Ownership Tax Receipt*, and a *Colorado Automobile Insurance Card*, all of which pertain to the van at issue in this matter.

75.     The *Certificate of Title* shows that Ms. Flores bought the van at issue from Jorge Luis Caldera on December 15, 2007, four days before the traffic stop at issue here. [Exh. B].

76.     Ms. Flores credibly testified that after she (accompanied by Defendant and Carina) bought the van, she "went to get insurance and then . . . went to motor vehicles to get a permit for the truck."  Ms. Flores' *Colorado Automobile Insurance Card* tends to corroborate this testimony inasmuch as it shows an effective insurance date of December 17, 2007. [See Exh. C].   The *Colorado Registration/Ownership Tax Receipt* similarly shows a purchase date of December 15, 2007, as well as "EXPIRE 03032008." [Exh. D].

77.     Ms. Flores testified that along with the registration she received a temporary permit (tag), which was valid until January 1, 2008, and which she affixed to the rear of the van.  According to Ms. Flores, this temporary permit was the only permit that was affixed to the rear of the van.

78.     Defendant consistently and credibly testified that

        a.      he was with Ms. Flores when she bought the van;

        b.      after purchasing the van, he and Ms. Flores obtained insurance, registration,

13

and a temporary permit for the van;

c.     the temporary permit was valid for approximately one month;

d.     he and Ms. Flores affixed the temporary permit to the rear of the van; and

e.     the temporary permit was the only permit affixed to the rear of the van.

79.    Neither the temporary tag (permit), which is so pivotal to this case, nor any depiction of it, was made a part of the suppression-hearing record. Deputy Maynes testified that despite his belief that the tag would have been an important piece of evidence, he neither photographed it nor removed it from the van following the traffic stop; instead, he "left it with the owner . . . left it up to them."

80.    For her part, Ms. Flores testified that, notwithstanding that she kept copies of the title, registration, and proof of insurance, she discarded the temporary tag "because [she] went to Mexico and . . . made the truck Mexican."

81.    Even though the temporary tag is not a part of the record, and there is no photograph or depiction of it, I find that it is reasonable to infer on the basis of the documents that *have* been admitted as exhibits and made a part of the record ( the *State of Colorado Certificate of Title*, the *Colorado Registration/Ownership Tax Receipt*, and the *Colorado Automobile Insurance Card*) that at the time Deputy Maynes initiated his December 19, 2007 traffic stop of the van at issue in this case, the van displayed a valid, as opposed to an expired, temporary tag.

82.    Consequently, I find and accept as credible the testimony of Ms. Flores and Defendant that when Deputy Maynes stopped their van, the van displayed a valid

14

temporary permit or tag.

83.    I do not find nor do I accept as credible Deputy Maynes' testimony that the temporary tag affixed to the back of the van "had a date of 2007."  Nor do I find or accept as credible Deputy Maynes' testimony that the tag had black letters and red numbers.

84.    I do find that, in addition to some minor inconsistencies in his testimony (*i.e.*, whether he used the Pic Quick facilities and whether Ms. Flores handed him a Colorado or a New Mexico driver's license) Deputy Maynes testified inconsistently and was not credible as to a number of matters of substance, including but not limited to the following:

    a.    the point in time at which Ms. Flores produced a valid registration for the van;

    b.    whether Defendant was in possession of any identification;

    c.    that he observed Defendant enter the van from the driver's side but later exit from the passenger side; and

    d.    the reasons he did not document in his written report that (1) Defendant walked away from the van once it had stopped and (2) Ms. Flores would not answer his questions before consulting Defendant.

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

In an *Indictment* returned March 25, 2008, Defendant was charged with reentry of a removed alien, in violation of 8 U.S.C. § 1326(a) and (b). [Doc. 8].  On May 19, 2008, Defendant filed *Defendant's Motion to Suppress and Memorandum in Support Thereof*, seeking to exclude all evidence seized as a result of the December 19, 2007 traffic stop,

including his fingerprints and evidence of his identity. [Doc. 19 at 1-3].

**A.    Legality of the Traffic Stop**

Defendant challenges the legality of the traffic stop here on the ground that Deputy Maynes lacked articulable reasonable suspicion of wrongdoing sufficient to justify the stop of the van in the first place.  The Court agrees.

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (*quoting* Delaware v. Prouse, 440 U.S. 648, 653 (1979).  Since an ordinary traffic stop is analogous to an investigative detention, the Court analyzes such a stop under the principles pertaining to investigatory detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005). To determine the reasonableness of an investigative detention, the Court conducts a two-part inquiry, asking first whether the officer's action was justified at its inception, and, second, whether it was reasonably related in scope to the circumstances justifying the interference in the first place.  Hunnicutt, 135 F.3d at 1348.

In a routine traffic stop, an officer may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation.  United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005).  Once those tasks are completed, however, a driver must be allowed to proceed on his way unless (1) reasonable suspicion exists that the driver is engaged in criminal activity, or (2) the driver consents to additional questioning.  Id.

16

A traffic stop will be deemed valid so long as the initiating officer has "a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Hunnicutt, 135 F.3d at 1348.  Indeed, one proposition for which Hunnicutt stands is that "[Tenth Circuit] cases make clear that the government need not show a violation actually occurred to justify an initial traffic stop."  Id.  Moreover, "[i]t is irrelevant that the officer may have had other subjective motives for stopping the vehicle."  Id.  Instead, the sole inquiry "is whether the particular officer had reasonable suspicion that the particular motorist violated 'any . . . of the multitude of applicable traffic and equipment regulations' of the jurisdiction."  Id. (quoting Prouse, 440 U.S. at 661); see also Gregoire, 425 F.3d at 876-879 (stop justified at inception where it was based on trooper's observed failure of driver to signal before merging into highway traffic).  On the other hand, a pretextual stop occurs when an officer uses some legal justification to stop a person or vehicle in order to investigate unrelated criminal matters for which the officer lacks reasonable suspicion. United States v. Fernandez, 18 F.3d 874, 876 (10th Cir. 1994).

In this case, Deputy Maynes testified that he stopped the box van because it bore what Deputy Maynes has maintained was an expired temporary Colorado tag, whereas Deputy Maynes knows that the laws of New Mexico require that vehicles have valid registration tags.  However, for the reasons set forth more fully above, the Court does not find credible Deputy Maynes' testimony that he observed an expired tag.  As explained, the *Certificate of Title* for the van shows that Ms. Flores bought the van December 15, 2007.  [Exh. B].  Ms. Flores credibly testified that after she bought the van, she "went to get insurance and then . . .

went to motor vehicles to get a permit for" it.  The *Colorado Automobile Insurance Card* tends to corroborate this testimony inasmuch as it shows an effective insurance date of December 17, 2007. [See Exh. C].  The *Colorado Registration/Ownership Tax Receipt* similarly shows a purchase date of December 15, 2007, as well as "EXPIRE 03032008." [Exh. D].  I credit Ms. Flores' testimony that along with the registration she received a temporary permit, which was valid until January 1, 2008, and which she affixed to the rear of the van.

While it is of some concern that neither the temporary tag itself nor a photograph of it was made a part of the record in this case, it simply does not make sense that all pertinent documents relating to this van would be in order *except for* the temporary tag.  In fact, it stretches the bounds of common sense.  Consequently, the Court concludes that Deputy Mayne's stop was not justified at its inception because Deputy Maynes was without reasonable suspicion that the van lacked a current and valid registration. See Hunnicutt, 135 F.3d at 1348.

Even if the Court could say that Deputy Maynes possessed reasonable suspicion to believe that the van was in violation of state traffic laws, the Court would still be constrained to determine that the resulting detention of Defendant (and his fellow travelers) exceeded the permissible scope of the stop.

As stated, in a routine traffic stop, once an officer completes the tasks of (1) requesting driver's  license, registration, and other documents; (2) running necessary computer checks; and (3) issuing warnings or citations, a driver must be allowed to proceed

on his way unless reasonable suspicion exists that he is engaged in criminal activity or the driver consents to additional questioning.   Gregoire, 425 F.3d at 879.   In this case, the Government does not contend that this encounter ever became consensual, so the only relevant question is whether Deputy Maynes had reasonable suspicion of criminal activity. The Court concludes that he did not.

According to Deputy Maynes, he continued to detain Defendant, Ms. Flores, and the others because their failure to provide him with valid registration, in conjunction with the van's slow roll to a stop and Defendant's attempt to walk away, caused him to believe that the van might have been stolen or it might have been transporting illegal immigrants.  Deputy Maynes also suggested that he believed the van might have been transporting drugs.[6]  Aside from what he perceived to be the van's possible reluctance to stop,[7] Deputy Maynes has identified none of the indicia—lack of proof of ownership of, or authority to operate, the vehicle; inconsistent statements about travel plans or destination; suspended license; the presence of air fresheners; or travel between so-called source cities—that the Tenth Circuit has held sufficient to support reasonable suspicion of criminal activity.  See Hunnicutt, 135 F.3d at 1349; see also United States v. Ledesma, 447 F.3d 1307, 1310 (10th Cir. 2006).

---

[6] At the suppression hearing, the following colloquy occurred:

Q: You suspected they were hauling drugs?
A: I suspected suspicious circumstances.  It could have been—I suspected a stolen van, I suspected the inside might contain immigrants.  My awareness heightened as my investigation went on.

[7]  As explained in the *Findings of Fact*, it is unclear whether the van stopped in response to Deputy Maynes' having activated his emergency equipment or because of the occupants' preexisting plan to visit the Franklin Road chile stand.

Deputy Maynes *did* testify that Defendant appeared "extremely nervous," but this was disputed inasmuch as Ms. Flores testified that Defendant was *not* nervous and, in any event, nervousness alone will not support reasonable suspicion of criminal activity.  United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998).

As explained above, I credit the testimony of Ms. Flores and Defendant that Ms. Flores provided Deputy Maynes with all necessary paperwork on the van at the time he asked for it.  At that point, any suspicion that Deputy Maynes might have had concerning the validity of the van's registration should have been dispelled.  His continued detention of Defendant, Ms. Flores, and the others was based on nothing more than "inchoate suspicions and unparticularized hunches[,]" which do not give rise to reasonable suspicion.  See United States v. Lyons, 510 F.3d 1225, 1237 (10th Cir. 2007).  Defendant's motion to suppress will be granted.

## III. CONCLUSION

For the reasons set forth more fully above, the Court concludes that Deputy Maynes did not have articulable reasonable suspicion to believe that the van belonging in which Defendant Pascual Lazcano-Nava was traveling on December 19, 2007 bore an expired registration and, therefore, Deputy Maynes was without justification to initiate a traffic stop. Moreover, even if the Court could say that Deputy Maynes' action was justified at its inception, the Court would nonetheless conclude that the ensuing detention was not reasonably related in scope to the circumstances justifying the interference in the first place. Consequently, *Defendant's Motion to Suppress and Memorandum in Support Thereof* will

be granted.

**IT IS, THEREFORE, ORDERED** that   *Defendant's Motion to Suppress and*

*Memorandum in Support Thereof* [Doc. 19] is **GRANTED**.

**SO ORDERED** this 8th day of September, 2008, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

21